Good morning, Your Honors. John Ballas on behalf of the appellant Tevin Tan. I'm intending to reserve two minutes for rebuttal. This appeal involves a Fourth Amendment challenge to evidence obtained pursuant to a search warrant. I'm intending to first respond to the government's argument that Tan's post-plea sentencing agreement waives this appeal, bars this appeal, and then second, focus on the primary issue on the merits, which said the search is invalid because the officer is intruded onto his front porch to his front door to look for evidence before the warrant was obtained. With respect to the waiver of appeal, our position is that the waiver in the sentencing agreement does not bar this appeal for three reasons. First, that the waiver is ambiguous, and in the unique circumstances of this case, does not cover the appeal of the district court's denial of the suppression motion. When, at the change of plea hearing, Judge Shub specifically informed Mr. Tan that he could appeal the suppression motion, but could not otherwise appeal the conviction. Right. But didn't he subsequently enter into a bargain with the government for which he got a benefit, he got the safety valve reduction, and in that agreement he waived his appellate rights? He did enter into a separate sentencing agreement. Our first argument that that doesn't apply because it's ambiguous whether it would cover the motion to suppress. It said that it would cover the conviction into a layperson. Well, what was left to appeal at that point, though? The sentence and the guilty plea. Well, on the conviction, what was the reason? It's hard to imagine that it didn't cover the order on the suppression motion, because there was really nothing. And I think for an attorney, I think that would be a reasonable assumption. But for a layperson whose English is not his first language, who the record shows his difficulty is communicating with his attorney, he asked for another attorney, I think that under the circumstances where the ---- I thought it was a simple deal. First deal, not so great, and he reserves the right to appeal denial of the motion to suppress. Second deal is terrific. He gets the safety valve and he gives up the right to any appeal. As you say, quite clear between the attorneys, but I don't really understand why it wasn't clear to him. Is the idea ---- I think the idea that you're suggesting is the judge has to specifically address him again, right? But how do we tell whether the judge did? I mean, when the judge says, does the defense have anything further to add, how do we know who the judge is looking at? Well, I mean, the judge could have just easily asked Mr. Tan directly, do you understand the agreement? Did you sign the agreement? What do we have precisely in the record about that? I don't remember. Well, there's ---- We have that he signed the agreement. Well, his signature is on the agreement. Right. Right. But he didn't ---- the judge didn't even ask him at the sentencing hearing, is that your signature on the agreement? Do you want ---- all the typical questions to either ---- For you. It's not about the signature. That's not contested now, I don't think, in the brief. He's not saying it's not my signature. There's no ---- there's nothing that says ---- but what he is saying, he said in his pro se briefs, what I'm arguing in these briefs, is that he didn't understand the agreement and also that ---- Well, look, here's what I'm getting at. I've got this dialogue at the sentencing. The judge says he's not sure what to do about the waiver of appellate rights and how enforceable it is. Do you think I should advise him of his right? The prosecutor says he thinks it's enforceable because he got the safety valve. The judge says he did, yes. And the judge says, all right, do you think I need to advise him of his right to appeal, Mr. Brace? And the defense lawyer says only as to the sentence, perhaps, but not anything else. That would seem to indicate a defense understanding that he's now waived his right to appeal denial of the motion of suppress. So it seems clear as a bell between the lawyers. Between the lawyers. And they asked his defense attorney, but they didn't ask Mr.---- Okay. Now let me ask you the next question. Let's suppose that the judge should have said, Mr. Tan, here's the deal. You're giving up your right to appeal denial of the motion of suppress. So the search is treated as though it was okay, whether it was or not. In exchange, the government's giving you the safety valve deal, so your sentence is going to be such and such. Do you understand that that's the deal you've made and do you want to make that deal? And I'm trying to think in terms of plain error terms, instead of the defense lawyer saying only as to the sentence, perhaps, but not anything else, he should have said, well, Judge, you ought to advise him again of his waiver. But suppose he didn't. Where's the denial of substantial rights and the indication that Tan would have done anything else? Well, the record has to show that it was a knowing and voluntary waiver. The argument is that it's not---- Okay. You have to get past O'Lano on that, don't you? Yes. But I think Arianna is not inconsistent with this case. And here there was actually, in prior cases, in other cases, when they have to show a knowing and voluntary waiver, the judge will ask some questions and then make a finding, either explicit or implicit, that he knowingly and understood the agreement. But here there is absolutely no questions of the defendant at all. All the questions were directed to the defense attorney. And especially in these circumstances where the defendant had the prior record of the judge telling him he could appeal the suppression motion, et cetera, I think there's not enough record to make that finding. Your time is running out. Do you want to address the merits? Let's assume you get over the appeal waiver issue. And on the Florida issue, if I get beyond that, on Florida v. Hardinas, I think it's clear that the officers violated Mr. Tan's Fourth Amendment rights by going on his porch or approaching his front door to search for evidence of a crime. And that's essentially the key part of the evidence in the search warrant affidavit. Well, they could approach the door, couldn't they? Not to search for evidence of a crime. Well, of course, they want to just go up and knock on the door and see who's home. If they go to the front door to knock and talk to the officers, that's appropriate under the knock and talk exception. Hardinas makes it clear that you look at the officer's conduct objectively to determine whether or not their purpose was for a search. And here it's clear because the affidavit says they were there to search for evidence. Was there case law at the time that allowed that, what they did? No. And it didn't. So you're relying on Florida v. Hardinas, and that was decided in 2013 and the searches took place in 2010. So what – so Florida v. Hardinas hadn't been decided yet. So what case are you relying on? Well, the cases that are cited on pages 9 and 10 of my reply brief, Davis, Garcia, Roberts, Hirsch, they all talk about it's appropriate for officers to go in to talk to – to approach a door or to talk to people, but it's not appropriate to go there as a – to search or to arrest someone for other purposes. So I think that Hardinas is not inconsistent with other Ninth Circuit law. I'd like to reserve my remaining time unless the Court has questions. All right. Good morning, Your Honor. This is Christian Highsmith for the United States. Why didn't – why didn't the government – when the judge said, do I need to talk to him about waiver again, why didn't the prosecutor say yes just to make sure? I don't know, Your Honor. I was not there during the sentencing. But I believe the key is that this waiver was entered into knowingly and voluntarily. A close look at all of the factors in the case. How do we know that? We know the lawyer was happy about it. He'd gotten a great deal for his client. We also know the client may not have real good judgment about a lot of things, like growing marijuana, and maybe he would have done the stupid thing. The record, I think, is very clear that he did understand it. First of all, there was only one purpose to that waiver. The only one purpose. When you say the record is very clear, give me the words. Absolutely. First of all, the agreement itself, Mr. Tan signed the agreement certifying that he had read it completely, that he understood it, and that he had voluntarily agreed to it. Okay. Number one, he signed the written deal. Yes, Your Honor. Number two, his attorney signed it saying that he had gone through it word by word with his client. Third, Your Honor, the district court at the sentencing hearing specifically addressed both parties and said, you know, and I paraphrase. Lawyers. Yes, said to both lawyers, but had an extensive discussion with both lawyers. He said to both lawyers, what should I do with this appellate waiver? When I was a district judge, when I asked that kind of question, what I was hoping for was the lawyers would protect me from error, and sometimes the prosecutor protected me from error. And the prosecutor didn't. I don't think that there was error here, because I think when we look at the, those statements to both of the lawyers, they specifically said, we've waived our rights to appeal the conviction. Okay. It's an unusual factual circumstance, and I don't think we have case law directly on point, but my opinion, Judge Hsu should have gone through a similar colloquy, because he was giving up rights. Now, to all of us lawyer, former lawyers and judges, it seems like he got a pretty good benefit. On the other hand, maybe he didn't fully understand. I mean, he had this motion to suppress that has some arguable merit here, and so maybe he thought he could still do that with the conviction, even though he had entered into something with respect to the sentencing. Again, I would just return to the fact that the only purpose of that waiver agreement was to trade his appellate rights for a specific sentence recommendation. That was a good deal. But then going back to all of those factors, you've got that one agreement with only one purpose. You have the specific statement from the district judge repeatedly.  Rule 11 says you have to ask the defendant specifically, and not just as lawyer. When the judge did the Rule 11 colloquy earlier in the case, as I recall, the colloquy says, you retain the right to appeal the denial of the motion to suppress. Here, we have a subsequent deal, which is better for the defendant, and part of the idea is he's selling his right to appeal the denial of the motion to suppress in exchange for a much better sentence, but the judge never asks him about it. Why does the judge's colloquy at the earlier time save this subsequent time where it's a different deal? I think it's the opposite. I don't think it's the earlier colloquy saves this deal. I think it's this deal saves the earlier colloquy, because there was confusion after that first change of the entry of the open plea. What this very simple agreement did was clarify that and said he gives up his right to appeal his motion to suppress, which he went through three times. He gives up his right to an interpreter. He specifically says I don't need an interpreter, I don't want one. And he goes through five hearings without an interpreter. This deal clarifies that. And then the other, you know, the other circuits that have addressed the issue of whether Rule 11 applies to a, this kind of a scenario where there's a waiver of appellate rights agreement, they have said that the court is not required to address that. Roberts, what I was getting at was in the first colloquy, the judge said, so, Mr. Tan, if the court accepts your plea, I would allow you to preserve your right to appeal from the denial of the motion to suppress. So what I was looking for was for the judge to say in the second colloquy, the one at sentencing, you remember the first time I told you you could preserve your right to appeal from the denial of the motion to suppress? Well, under this new deal, you can't. Do you understand that? That would have been much easier. What, you know, let's assume that the defendant gets over this issue. Can you address the merits of his underlying challenge to this? Absolutely. Sure. First of all, in terms of the probable cause, the probable cause was, I think, sufficient and no doubtly on good faith applies. Second, for the Hardeen example, the record is clear. There are three different instances where at the various suppression motions, the defense lawyer asks the law enforcement witnesses what happened with Detective Gueda. The testimony is always he approached the front door, he went up to the front door, he walked to the front door, toward the front door three times during the suppression hearings, where the burden is on the defense and where they need to establish a basis for suppression. The record is very clear that he approached the front door consistent with the property law license. In fact, there is no violation of Jardin because he, the record objectively shows that he intended to go up to the front door. Of course. Not for the purposes of a search? They didn't want to talk to him. They wanted to see if they could find any clues. We don't know that, Your Honor. We look at the record as it is. The record as it is has those three statements. Now, he hears those fans as he's walking to the front door. It would not make sense for him to then go and knock on the door after he knows there's a marijuana grow there. Okay. Let's look at this affidavit by Brian Swenson. Where does it say what you need it to say? I've got it right here. Yeah, it's the affidavit is, it's the May 4th. It's a paragraph. I believe it's paragraph 19, Your Honor. Okay. I'm trying to find out where he says what he went up to the front door for. It does not say. It does not say what he – there's no statement where he says what he went up to the front door, Your Honor. We can only look at the factors.  The first sentence. What I infer from all this stuff in the previous paragraphs about how the guy is probably a dope dealer and there's probably a stash in there is that he's going up to the front door to investigate and not for a chat. So I'm looking for the statement where he says I'm going up there to chat. It does not say – nowhere does it say I'm going up there to chat. He just says he approached the door. Precisely. He approached the door and he heard the fans. Yes, Your Honor. Or the noise. Yes, Your Honor. And my contention is that under the case law at that time in 2010 and also under Jardin, because the circumstances objectively show that he entered the curtilage for the intent of approaching the front door to have a knock and talk, he did not extend the scope of his property law license. We don't know it's a knock and talk. All we know is he approached the front door and was within the curtilage. Yes, Your Honor. So what authority made it okay before Jardinez or Jardines? Garcia, Roberts, both of those cases. It's never – it can't be – it doesn't make sense that the rule is he has to complete the knock. I mean, there have been cases where an officer, under the property law license, you know, a newspaper delivery person doesn't go up and knock on your door. They drop the newspaper off. There's been cases on the Ninth Circuit. You've read Jardinez, and what it says is that the general license to the public to approach the front door for all sorts of things doesn't encompass the right to approach the front door, be within the cartilage, for investigatory purposes by the police. Absolutely, Your Honor. First of all, Jardinez doesn't apply here because this happened 5 or 3 years beforehand. So under that existing precedent, we've got Garcia, we've got Roberts. Do we have some good authority that says it doesn't apply before, that it's not retroactive? Yeah. I think Thomas, I think the Thomas case says that, Your Honor. In that case, there was the drug detection dog which went to the traffic stop, the highway traffic stop, and the court specific – this court specifically said in Thomas from 2013 essentially that neither Jardinez nor Jones were retroactive, and so that's why I think it's the officers at that point, their then – their reliance on then existing precedent controls in that scenario. So without further questions, I would ask that the Court affirm the district court's ruling and uphold the appellate waiver. Thank you very much. Thank you. Okay. Mr. Voss? I just want to point out in the search warrant affidavit on paragraph 33, two sentences before it states, and this is on excerpt of record page 17, that the detective approached the front door. The first sentence of that paragraph says that they conducted surveillance to look for signs commonly associated with marijuana growing operations. If they were there to do a knock and talk, they could have said that. They would have said that. We're here to knock and try to talk with Mr. Tan. But it was clear that they were there for the purpose of looking for evidence of marijuana. Did they sort of sneak around? I think at this point, there was not much of a record on that. They just went up to the front door, heard, supposedly heard the fans, and then left If they were going to do a knock and talk, they would have, especially if they heard the fans, they would have knocked and talked, not left. Right. They would have knocked and talked. And I just want to, with respect to the Ninth Circuit, this Court's case, Thomas, I think that is inapplicable in terms of it was a vehicle search. It wasn't a search into the curtilage of someone's home. So I think it doesn't have applicability here. Thank you. Any further? All right. Thank you. This United States v. Tan is submitted. And we'll take up Rocha v. Tulare County and Macy's.
judges: Kleinfeld, Wardlaw, Paez